2009 VT 73

# State of Vermont v. Christopher Harris

[980 A.2d 785]

No. 08-080

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed July 16, 2009

*David W. Gartenstein, Steven M. Brown,* and *Scott A. Willison,* Windham County Deputy State's Attorneys, Brattleboro, for Plaintiff-Appellee.

*Matthew F. Valerio,* Defender General, *Anna Saxman,* Deputy Defender General, and *Daniel Stevens,* Law Clerk, Montpelier, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant appeals, following a second jury trial, his conviction of operating a motor vehicle with a blood alcohol concentration above the 0.08% legal limit. He raises two issues on appeal. First, he contends the trial court erred by denying his pretrial motion to suppress the evidence against him. Defendant's suppression motion argued that the arresting officer lacked a reasonable suspicion to stop defendant because the only basis the officer had for the stop was defendant's failure to use a turn signal when he exited a traffic rotary. According to defendant, the traffic laws did not require him to signal when he exited the rotary. Second, he argues that the trial court erred in its decision not to play the State's expert witness's cross-examination and redirect-examination testimony back to the jury after the jury asked the court several questions related to the witness's testimony. We reverse and remand the trial court's decision on the suppression motion. If, on remand, the motion is granted, defendant is entitled to a new trial. If the motion is denied, his conviction is affirmed.

¶ 2. In June 2005, at about 1:30 a.m., a state trooper stopped defendant when the trooper observed defendant exit a rotary in Brattleboro without using his turn signal. After the trooper approached the car and spoke with defendant and his passenger, the trooper determined that defendant had been drinking and proceeded to give defendant several roadside sobriety tests. Based on his test performance, the trooper brought defendant to the police barracks where defendant provided several breath samples for a Datamaster machine, which allows law enforcement officers to measure suspects' blood alcohol content (BAC). At the time of the sampling, which occurred about forty minutes after the traffic stop, defendant's BAC measured 0.079%. Initially, the State charged defendant only with driving under the influence of alcohol, 23 V.S.A. § 1201(a)(2), but it later added a charge for operating a vehicle with a BAC of 0.08% or higher, *id.* § 1201(a)(1).

¶ 3. Prior to trial, defendant moved to suppress the evidence against him as the fruit of an illegal stop. To carry out a legal traffic stop, a law enforcement officer must have a reasonable, articulable suspicion of wrongdoing. *State v. Lussier*, 171 Vt. 19, 34, 757 A.2d 1017, 1027 (2000). Reasonable and articulable suspicions of motor-vehicle violations are sufficient to justify traffic stops. *Id.* As the state trooper later testified at trial, and as both

parties agreed in their motion arguments, the trooper pulled defendant over for the sole reason that defendant exited the rotary without using a turn signal. There was no evidence, and the trooper never testified, that defendant changed lanes without using a turn signal or that he sped or drove erratically. The trial court denied defendant's motion, concluding that exiting a rotary is a change of direction, and under the turn-signal statute, "a driver shall give warning of his or her intention" "[b]efore changing direction." 23 V.S.A. § 1064(a). According to the court's reasoning, when the state trooper observed defendant exit the rotary without signaling, the trooper had a reasonable and articulable suspicion that defendant violated a motor vehicle law, which was sufficient to justify the stop. Following the trial court's denial of the suppression motion, the case proceeded to a jury trial. Defendant's first trial resulted in a hung jury, and after a second jury trial, defendant was convicted of driving with a BAC above the legal limit, but acquitted of driving under the influence of alcohol.

¶ 4. This case presents a statutory construction issue of first impression, namely to what extent, if at all, does Vermont's turn-signal statute apply to traffic in rotaries. The turn-signal statute requires, pertinent to this case, that a driver use a signal "[b]efore changing direction," "to indicate an intention to turn," and to give the signal "continuously during not less than the last 100 feet traveled by the vehicle before turning." *Id.* § 1064(a), (d), (e). Vermont's sole statutory provision addressing vehicle travel in rotaries states: "A vehicle passing around a rotary traffic island shall be driven only to the right of the island." *Id.* § 1037(c).

¶ 5. When construing a statute, our "goal is to implement the Legislature's intent." *State v. Stell*, 2007 VT 106, ¶ 12, 182 Vt. 368, 937 A.2d 649. The starting point is the statutory language, and we "assume the Legislature intended the plain and ordinary meaning" used. *Id.* The parties here argue over whether, as a matter of law, a car changes direction or turns when it exits a rotary so as to fall within the required situations for use of a turn signal.[1] Defendant argues that when a car drives around a rotary, it

---

[1] The State argues on appeal that defendant also changed lanes when he exited the rotary. The turn-signal statute requires use of a signal when a driver changes lanes. 23 V.S.A. § 1064(e). However, this argument was not made below, it was not the basis for the district court's decision, and we will not consider it here. *State v. Hunt*, 150 Vt. 483, 499, 555 A.2d 369, 379 (1988).

continually changes direction, and the only time a car does not change direction in a rotary is the point at which it exits and continues in a more or less straight line away from the rotary. The State contends that when a car is in a rotary, it is moving in one direction, namely, a counter-clockwise circle, and that exiting the rotary is a change of direction because the car must make a right turn off the circle. We conclude that the trial court erred in denying the motion to suppress without expressly finding that defendant turned or changed direction when he exited the rotary.

¶ 6. In a motion to suppress based on an illegal search or seizure, the defendant bears the burden of proving that a seizure occurred. *State v. Nault*, 2006 VT 42, ¶ 16, 180 Vt. 567, 908 A.2d 408 (mem.). Once the seizure is established, in cases where law enforcement acted without a warrant, the government bears the burden of justifying the intrusion. *State v. Badger*, 141 Vt. 430, 433, 450 A.2d 336, 344 (1982) (holding that the State has the burden of justifying warrantless seizure of physical evidence); see also *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (warrantless seizure); *State v. Rand*, 430 A.2d 808, 817-18 (Me. 1981) (warrantless seizure). It is not disputed that the traffic stop in this case was a warrantless seizure within the meaning of the Fourth Amendment of the United States Constitution and Article 11 of the Vermont Constitution. Defendant's suppression motion clearly stated that his objection to the stop was that it "was unsupported by a reasonable suspicion of any violation of law" and that he "did not have an obligation under law to use his turn signal in negotiating the rotary." Although defendant requested an evidentiary hearing if the State objected to his motion, and the State did object, the trial court determined that no hearing was necessary because the parties agreed on the relevant facts and presented only legal arguments.

¶ 7. The district court ruled, essentially, that exiting a rotary is a change of direction as a matter of law. Based on this conclusion, the court held that defendant was required to use a turn signal when he exited the rotary, and his failure to do so constituted a violation of the turn-signal statute, which, in turn, justified the traffic stop. We cannot agree with the trial court's determination that any exit from any rotary is necessarily a change of direction, absent evidence of an actual change of direction in this case. The layout of rotaries, especially their size and the orientation of their entry and exit points, can vary

greatly. It is possible that in some rotaries the entry and exit locations would be located in such proximity to each other that a vehicle could travel through the rotary without making any discernible or significant change in direction. For example, the path from a rotary entry point to the first exit may require no change of direction, allowing a driver to follow a straight trajectory. Given this kind of possibility, and because the turn-signal statute is silent on the subject of rotaries, and the only statutory provision addressing rotaries is silent on the subject of turn signals, it would have been necessary for the State to demonstrate that defendant's exit off of this particular rotary constituted a change of direction in order to justify the traffic stop. However, the State offered no evidence on this issue, arguing simply that any exit off of any rotary is a change of direction.

¶ 8. In reviewing a ruling on a suppression motion, we examine "the district court's factual findings for clear error and its legal conclusion de novo." *State v. Sole*, 2009 VT 24, ¶ 17, 185 Vt. 504, 974 A.2d 587. The undisputed facts here are that defendant exited the rotary without using a turn signal. Although the police officer's affidavit states that this occurred "while [defendant was] turning right," defendant disputes whether he was making a turn. In ruling on the suppression motion, the court declined to hold a hearing and made no further factual findings regarding the rotary in question or defendant's travel in the rotary. Instead, the court's conclusion that the stop was justified is based on an unsupported legal conclusion that any exit from a rotary constitutes a change of direction within the meaning of the turn-signal statute. Because we cannot agree with the legal conclusion, we reverse the court's denial of defendant's suppression motion and remand for consideration of the relevant evidence.

¶ 9. Defendant's second argument on appeal relates to the court's response to questions posed by the jury during deliberations. We reach this argument in the event that the court denies defendant's suppression motion on remand. During the trial, the prosecution presented an expert witness to testify to the operation and standards of the Datamaster machine that was used to measure defendant's BAC. The expert testified that the Datamaster may operate with a 10% margin of error under Department of Health and Safety regulations. The expert also explained how to use a Datamaster reading to calculate what a suspect's BAC was at a given time prior to the time of the

reading, i.e., when he was operating the vehicle. According to the expert, if the Datamaster reading was accurate, assuming no margin of error, and defendant eliminated alcohol from his body at the rate at which 95% of the population eliminates alcohol, then his BAC was 0.09% at the time the trooper stopped him. On cross-examination, the defense established that the alcohol-elimination rate relied upon by the expert was not specific to defendant, and that his body might eliminate alcohol at a slower rate than the general rate. The expert testified on redirect examination that if she used the slowest elimination rate then defendant's BAC would have been 0.086% at the time of the traffic stop, which was still above the legal limit.

¶ 10. During deliberations, the jury asked two specific questions related to the calculation: first, "[i]f the most favorable math is used, does defendant get below the 0.08% BAC?"; and second, "[t]o what number do we apply the 10% margin of error?" It also requested to listen to the expert's testimony again. The judge responded by playing back the testimony from the direct examination of the expert, then asking the jury if it wanted to hear more, or if the direct examination was all they needed. At least some of the jurors indicated they needed to hear only the direct examination. After hearing the jurors' responses, the judge elected not to play any further testimony. Although defendant did not object to this procedure at the time, he now argues that playing back only the direct examination was error because if the judge had played back the full testimony the jury would have realized that if the math were done in the manner most favorable to defendant, his BAC would have been only 0.078% and thus below the legal limit. Given defendant's failure to object to this process at trial, we review for plain error only. *State v. Bain*, 2009 VT 34, ¶ 8, 185 Vt. 541, 975 A.2d 628.

¶ 11. Defendant is correct that if the jury had carried out the calculations in the manner most favorable to the defendant it could have concluded that defendant's BAC was below 0.08% at the time of the traffic stop. However, defendant is incorrect in arguing that the jury could not have reached this result without listening, for a second time, to the expert's responses on cross-examination and redirect examination. All of the information the jury needed to calculate defendant's BAC using the math most favorable to defendant was contained in the expert witness's responses to her direct examination. During the direct examina-

tion, the expert stated that the Datamaster may operate with a 10% margin of error. Further, the expert stated that alcohol-elimination rates can range from 0.010% to 0.020% of alcohol per hour. The jury also knew that the Datamaster tests were taken at 2:19 a.m. and 2:20-2:21 a.m., and that defendant had been stopped by the trooper at about 1:36 a.m. The jury needed no further information to determine defendant's BAC using the math most favorable to defendant, which would have put his BAC at just under the 0.08% legal limit at the time of the stop.[2]

¶ 12. On appeal, defendant argues that the expert's testimony on cross-examination and redirect examination "directly answered the jury's questions." This is an overstatement. Our review of the trial transcript reveals that there was no point in the expert's testimony when she either explained how to apply the margin of error to the Datamaster reading or calculated defendant's BAC at the time of the traffic stop using both the most favorable elimination rate and the 10% margin of error. In other words, none of the expert testimony directly answered the jurors' questions. Because defendant's entire argument on this point centers on whether the jury had sufficient information to mathematically calculate defendant's BAC, and the jury did have that information from the expert's testimony on direct examination, there is no reason to find error — let alone plain error — in the judge's decision to play back only that portion of the testimony.

*Cause remanded for an evidentiary hearing on defendant's motion to suppress. If the motion is granted, defendant shall be granted a new trial. If the motion is denied, the conviction shall be affirmed.*

---

[2] The "most favorable" calculation available to defendant appears to be as follows: first, subtract the 10% margin of error from the Datamaster reading of 0.079 $(0.079-(0.1 *0.079)=0.071)$, then add the lowest elimination rate of 0.010 per hour for the forty-three minutes between the time of the stop and the time of the Datamaster test to the resulting reading $(0.071 + ((43/60) *0.010)=0.078)$.